180 So.2d 716 (1965)
MURPHY CORPORATION
v.
PETROCHEM MAINTENANCE, INC., et al.
No. 6460.
Court of Appeal of Louisiana, First Circuit.
November 16, 1965.
Rehearing Denied December 21, 1965.
*717 Boris F. Navratil, of Breazeale, Sachse & Wilson, Baton Rouge, for appellant.
David M. Ellison, Jr., of Taylor, Porter, Brooks, Fuller & Phillips, John S. White, Jr., of Kennon, White & Odom, Fred H. Belcher, Jr., of McCollister, Belcher, McCleary & Fazio, Baton Rouge, for appellees.
Before ELLIS, LOTTINGER, LANDRY, REID and BAILES, JJ.
LANDRY, Judge.
This action initiated as a suit by plaintiff, Murphy Corporation (sometimes hereinafter referred to simply as "Murphy"), a wholesale distributor of petroleum products, against Rheem Manufacturing Company and Petrochem Maintenance, Inc (sometimes hereinafter referred to as "Rheem" and "Petrochem", respectively), to recover certain damages reputedly sustained by Murphy due to the leakage of a 10,000 gallon underground gasoline storage tank which Murphy purchased from Rheem and which tank was installed by Petrochem on certain property under lease by one of Murphy's retailers, Food Town Ethical Pharmacies, Inc. (sometime hereinafter referred to as "Food Town"). Petrochem reconvened praying for judgment against Murphy for the cost of removing the defective tank and installing its replacement.
The trial court rendered judgment rejecting plaintiff's main demand and awarded damages to defendant Petrochem on its reconventional demand against Murphy. Certain third party demands were filed by the original defendants which incidental actions in turn spawned still other counterclaims and third party suits as will hereinafter appear.
A brief narration of the events and circumstances prompting the main demand herein is essential to a clear understanding of the issues raised by the numerous claims and counterclaims presented by the instant appeal.
In October, 1961, Murphy entered into an agreement with Food Town, in pursuance of which the latter agreed to retail the former's products, provided Murphy would modernize an old service station then existing on certain premises leased by Food Town in the City of Baton Rouge. The contract, if in writing, is not of record. The transcript does show, however, a chattel mortgage dated October 2, 1961, securing a note in the sum of $12,613.68 executed by Food Town in favor of Murphy on the *718 following property: 8 computing pumps; two underground gasoline storage tanks with a capacity of 10,000 gallons each, 4 whiteway lights; 2 tapered poles; 1 air compressor, 4 air and water standards; and 1 T-pole with lighted price signs. It is acknowledged that Murphy purchased two 10,000 gallon tanks from Rheem and arranged for Southern Transfer Company, Inc. (sometimes hereinafter referred to as "Southern"), to transport the tanks to the installation site. Murphy also asked for bids for renovation of the service station in question including the installation of the two storage tanks, and awarded the contract for the work to defendant Petrochem. Neither the request for said bids, the bids themselves nor the contract between Murphy and Petrochem were placed of record herein. Petrochem, however, entered into a subcontract with one J. V. Pearson to excavate the necessary hole with a dragline and lower the tanks into the resulting pit.
Approximately three months after completion of the work, Food Town's employees discovered that the tank utilized for the storage of "regular" gasoline contained water in amounts exceeding that usually encountered as the result of normal condensation. Repeated tests, the nature of which are immaterial, indicated water was entering the tank from a leak in the underground facility. By digging around the tank and pressure testing its piping arrangement, it was ultimately determined the leak was in the tank itself rather than in the inlet and outlet components thereof. Careful hand excavation eventually disclosed the leak at the very bottom of one end of the tank where a weld had been opened by a blow from some unknown source. Petrochem removed the defective tank and replaced it with a new one of similar size ordered by Murphy from Rheem. Meanwhile, to retain its customers, Food Town connected a regular gas pump to the remaining tank which contained premium gasoline and sold premium gasoline at regular gas prices to patrons requesting the less expensive fuel. Murphy, as the general contractor, reimbursed Food Town its losses so sustained and seeks recovery thereof in its main demand together with the cost of the new tank.
Appellant's initial action is predicated on the alleged concurrent negligence of Rheem in improperly unloading the tank and that of Petrochem in failing to properly test the tank before installation and installing the receptacle in a faulty and improper manner. In response to Murphy's main demand, Petrochem third-partied its co-defendant, Rheem, alternatively, on the grounds Rheem manufactured and delivered a defective tank, failed to properly inspect and test the reservoir before delivery, improperly loading the tank on the conveyance for transportation to the job site and negligently unloading the tank upon delivery. Third-party defendant, Rheem, in turn, third-partied Southern alleging the defect in the tank resulted from its negligent unloading at the job site by Southern and prayed for judgment against Southern in whatever amount might be awarded Murphy. In offset of Petrochem's reconventional demand, Murphy filed third party petitions against Rheem and Southern for any sum Petrochem might recover thereon. In turn, Rheem third-partied Southern praying for judgment against said third party defendant in any amount Murphy was awarded on its third party demand against Rheem or, alternatively, for contribution by Southern. Finally, Southern filed an exception of prescription against the third party action of Murphy.
The appeal by Murphy alleges the following errors:

"SPECIFICATION OF ERRORS
I. The Trial Judge erred in holding that `proper workmanship' contemplated by Article 2762, R.C.C., does not require the contractor to make an inspection of materials and equipment delivered to him for the project he is undertaking and does not require him to perform *719 such tests as in his expert opinion are desirable to assure a final product free of defects.
II. The Trial Judge erred in not holding Southern Transfer Company responsible for losses sustained by plaintiff as a result of a defective tank delivered by it, under the doctrine of `res ipsa loquitur'.
III. The Trial Judge erred in not concluding that plaintiff had proved its case against Southern Transfer Company to a reasonable certainty by circumstantial evidence."
We note that appellant has apparently changed the basis of its case from the alleged negligence of Petrochem in failing to pre-test and properly install the tank coupled with the asserted concurrent negligence of Southern in improperly unloading the facility, to the avowed breach by Petrochem of the contractual obligation arising from the "Letting Out of Labor and Industry" imposed by LSA-C.C. Article 2762. Considering the stipulations of LSA-C.C.P. Article 2164, which direct the appellate courts to render such judgment as is just, legal and proper upon the record on appeal, we will consider appellant's contention that it is entitled to prevail upon the basis of the hereinabove cited statutory authority.
Before considering the legal issues thus raised, we note that in both brief and oral argument before this court, esteemed counsel for appellant concedes the record is barren of evidence to support judgment in its favor against Rheem. Nevertheless, able counsel suggests this court should have the opportunity to pass on all facets of the controversy, including the alleged liability of Rheem under the doctrine of res ipsa loquitur. Granting that LSA-C.C.P. Article 2164 imposes a rather broad mandate upon the appellate courts, we do not believe it was intended to eliminate the adversary nature of our procedural law or impose on the courts the duties of an advocate. In addition, the record reflects that in pretrial conference, appellant Murphy voluntarily abandoned the contention in its third party petition filed in response to Petrochem's reconventional demand, that Rheem manufactured a faulty tank. Inasmuch as Murphy now concedes Rheem is not liable on the principal demand, Southern's association with Murphy's main demand passes from the case because Southern's connection with Murphy's principal action arises solely from Rheem's third party petition thus limiting Southern's liability to responding to Rheem for any adjudication against the latter.
Murphy's claim against Southern, in response to the reconventional demand of Petrochem, will be considered in the discussion of said reconventional demand.
We will first resolve appellant's main demand. From the issues made by illustrious counsel for appellant, we understand Petrochem's asseverated liability to be predicated on one of the following theories: (1) the contractual obligation imposed upon the undertaker of works pursuant to LSA-C.C. Article 2762; (2) Petrochem, through its agents and/or employees, negligently damaged the tank; and (3) the doctrine of res ipsa loquitur applies thus imposing upon Petrochem and the other parties the burden of establishing how the tank was damaged and absolving themselves from fault which onus they allegedly have not discharged.
The record establishes the tank in question was unusually large having a diameter of 96 inches and a length of 26 feet eight inches. It was constructed of hot-roll, quarter inch, low carbon steel plate and weighed an estimated six tons. After fabrication, it was pressure tested by Rheem in accordance with specifications of the Underwriters Laboratories and bore a label so attesting. The tank was covered with a thick coating of tar to inhibit rust and thus prolong its life as an underground storage facility. Rheem shipped the tank from its *720 plant in New Orleans by means of a low-boy towed by a truck or tractor, a low-boy being shown to be a long flat-bed trailer standing approximately two and one-half feet high. The tank was loaded aboard the low-boy by means of a crane and fork lift. The procedure followed was that a sling was placed around one end of the tank which end was lifted by the crane while the other end was simultaneously raised with the fork lift. Although the tank is shown to have "eyelets" welded to its surface and designated to accommodate cables for lifting by means of a crane, it is not clear from the record why the eyelets were not used and the tank loaded by a crane alone. On October 4, 1961, both tanks were delivered to the job site by one Delbert Slayton, who normally drove a truck for Rheem but who, on this particular day, was admittedly employed by Southern. Unloading was accomplished by placing two large truck tires as each end of the low-boy approximately five feet from the trailer. The tanks were then shoved from the bed of the low-boy, onto the tires which served to cushion their fall, by means of a hydraulic jack placed in the center of each tank and used as a lever to move or roll these cumberson receptacles. After being thusly deposited at the job site, the tanks remained on the ground for approximately one week before the hole necessary for their installation was excavated by an employee of J. W. Pearson using a dragline for said purpose. Upon completion of the pit, each tank was lifted and placed in the excavation by means of the same dragline using cables attached to the eyelets affixed to the tanks for such purpose. When in place in the hole, each tank was supplied with anchor straps placed over either end and secured to anchors driven into cross-channels dug in the hole prior to setting the tanks. After the anchors were fastened in the cross-channels, the channels were then filled with concrete thus insuring stability. The necessary piping connections were then made by Petrochem, each being pressure tested, before the tanks were covered with earth and the surface paved with concrete, by isolating the various pipes and valves. It is acknowledged the tanks themselves were not pressure tested prior to being placed in the excavation.
When the leak in the tank used for the storage of regular grade gasoline was discovered, it was found to result from a dent on the bottom of the tank which caused a rupture or spilt of the welded seam at one end. Our learned brother below found it impossible to determine with any degree of certainty how or when the damage occurred to the tank in question. After careful review of the record, we are likewise unable to conclude when, where or how the damage resulted. Despite its inability to establish how the puncture resulted, appellant nevertheless maintains Petrochem was under the obligation to pressure test the tank prior to installation or, stated otherwise, that LSA-C.C. Article 2762, renders Petrochem absolutely liable for poor workmanship including defective components and materials notwithstanding such materials and components may have been furnished by the owner rather than Petrochem itself.
It is undisputed that in bidding for the contract, Petrochem did not include pressure testing the tanks prior to installation as an item to be performed under the agreement since Murphy neither requested nor required preinstallation pressure testing. It appears, however, that some petroleum distributors require pressure testing antedating installation whereas others do not. Prior to this instance Petrochem customarily included the cost of pressure testing in its contract price where such testing was stipulated by the oil company involved, but omitted such item when testing was not expressly required. It is conceded that, since this unfortunate occurrence, Petrochem has invariably included the cost of pressure testing in all its bids notwithstanding such tests may not have been required by the owner. This circumstance, however, does not affect the antecedent contractual relationship between Petrochem and appellant.
*721 Mr. Arthur J. Jecha, employee of appellant, conceded there was no stipulation in the contract for a prior pressure test. His testimony further establishes that appellant did not consider Petrochem legally obligated to undertake pretesting except "for its own protection."
It would appear the issue resolves itself to the question whether the liability incumbent upon the contractor with respect to use of defective materials pursuant to LSA-C.C. Article 2762 is absolute.
The codal authority invoked by appellant reads as follows:
"Art. 2762. Liability of contractor for
 damages due to badness
 of workmanship
Art. 2762. If a building, which an architect or other workman has undertaken to make by the job, should fall to ruin either in whole or in part, on account of the badness of the workmanship, the architect or undertaker shall bear the loss if the building falls to ruin in the course of ten years, if it be a stone or brick building, and of five years if it be built in wood or with frames filled with bricks."
We note the cited article appears in Title IX "Of Lease," Chapter 3 "Of the Letting Out of Labor or Industry," Section 3 "Of Constructing Buildings according to Plots and Other Works by the Job, and of Furnishing Materials." It is also worthy of note that the articles contained in this Section of the Civil Code have been read in pari materiae. Brasher v. City of Alexandria, 215 La. 887, 41 So.2d 819. Petrochem contends Article 2762, supra, applies only to building construction and has no pertinence to contracts unrelated to the erection of structures, such as in the present case where the work to be performed was installation of underground gasoline storage tanks. The argument is without merit considering no such distinction is made in either our Civil Code or jurisprudence. In this regard LSA-C.C. Article 2756 provides as follows:
"Art. 2756. Building by plot and work
 by job, definitions
Art. 2756. To build by a plot, or to work by the job, is to undertake a building or a work for a certain stipulated price."
Jurisprudentially, the provisions of the applicable article have been held to pertain to a contract to extend and correct deficiencies in an existing sewer system. Brasher v. City of Alexandria, 215 La. 887, 41 So.2d 819. The Brasher case, supra, makes it clear the provisions of Article 2762 LSA-C.C. apply to contracts for the performance of jobs other than the construction of buildings, including work of the nature involved in the instant matter.
Moreover, the pertinent article has been interpreted to extend liability of the contractor thereunder to damages resulting to the owner from the use of defective materials. Delee v. Hatcher, 19 La.Ann. 98; Draube v. Rieth, La.App., 114 So.2d 879; Parker v. Brown, La.App., 150 So.2d 306. In the early case of Delee v. Hatcher, supra, we note the following pertinent language:
"A careful examination of the facts of the present controversy has satisfied us that it must be governed by Article 2733 of the Civil Code, which is a modification of Article 1792 of the Code Napoleon; and, referring to this last article, Marcade considers it as much a matter of public order as of private interest; and it is for the undertaker, in the exercise of his art, to ascertain if the materials to be employed in a construction are suitable.
The badness of the workmanship comprehends not only a defect of construction, but, likewise, the using of bad materials, notwithstanding these materials be furnished by the proprietor, as it is the duty of the undertaker to reject them. Vol. 6, p. 536, Art. 1."
*722 It is of considerable significance that Article 2733 of the Civil Code of 1825 is identical to Article 2762 of the Revised Civil Code of 1870, excepting only an inconsequential punctuation change. Also worthy of note is the fact that the foregoing quotation from Delee v. Hatcher indicates the French authorities, on which our Civil Code is founded, placed a duty on the contractor or undertaker to ascertain whether materials furnished by the owner of a work or project are suitable. Similarly, in the early case of Mouton v. Droz, 16 La. 111, the defense of a contractor that the defective condition of a roof he installed was due to bad shingles furnished by the owner, was rejected because of defendant's failure to object to the poor quality of the materials before their installation.
Subsequently, however, in 1939 the Court of Appeal, Orleans, in Poirier v. Zaidman, 192 So. 382, held that a proprietor who furnished lumber of poor quality, obtained from the demolition of another structure, could not justly complain of imperfections in the building due to substandard material.
While the early decisions hereinabove discussed do indeed impose responsibility upon the contractor for damages resulting from defective material furnished by the owner, we detect therein no language indicative of intent to make said obligation absolute. In our judgment, a rule which imposes absolute liability or which places responsibility upon the contractor without qualification, restriction or limitation, is contrary to reason and inconsistent with principles of equity. In this regard, we note that a distinction, depending upon whether the materials are furnished by the owner or contractor, is made in the Civil Code with respect to the rights of the parties in the event the work is destroyed prior to delivery. See LSA-C. C. Articles 2758, 2759 and 2760. In substance, the cited articles provide that where the work is destroyed prior to delivery, as the result of defective materials furnished by the proprietor, the contractor may nevertheless claim the contract price. We are not presently concerned with an interpretation of these articles except to note the distinction above remarked. We believe, however, there appears no valid reason to impose a greater burden on the contractor after the work is accepted than is incumbent upon him before completion and delivery.
In our judgment, the crucial issue presented with respect to the liability of the contractor pursuant to LSA-C.C. 2762, is what duty of inspection or examination is required of the contractor when materials are furnished by the proprietor? Unfortunately, the criteria afforded by the cited authorities are not entirely clear. Our careful consideration of the quoted cases discloses the descriptions of the factual situations therein involved are scantily reported and lacking in detail. In our opinion, the Poirier case, supra, may be reconciled with the two older cases because in Poirier it may be inferred the proprietor was as aware of the condition of the material as was the contractor since she knew it originated from a demolished building but nevertheless directed the contractor to use such lumber. It would further appear that any warning by the contractor would have served no useful purpose. In the Mouton case, supra, the shingles were of such poor quality that a carpenter testified he could not guarantee a roof constructed with them. The contractor therein was charged with the duty of objecting to their use ostensibly because he was in a better position than the owner to judge and evaluate their suitability. According to the hereinabove quoted language from the Delee case, supra, the French commentator Marcade asserts the contractor's duty in such instances is "in the exercise of his art, to ascertain if the materials to be employed in a construction are suitable," and "to reject them" if he finds them unsatisfactory.
We believe the duty thus imposed extends, in cases where materials are furnished by the owner, to defects which are either patent or discoverable upon ordinary and reasonable inspection by the contractor, due regard being given in each instance *723 to the contractor's greater opportunity to notice or discover defects or, through his superior and technical knowledge, to recognize the suitability of the material. We do not consider that the law makes the contractor the absolute guarantor of the quality of materials furnished by a proprietor. To do so would impose upon the contractor the unconscionable and unreasonable burden of submitting to minute and highly technical test and examination each and every component of any material, device, equipment or apparata furnished him by the owner for incorporation into a work or project. Such a rule would impose upon the contractor the duty of inspecting for and guarding against any and all latent defects in manufacture as well as any hidden or not reasonably discoverable damage occurring while the material, equipment or apparata is in the possession of the owner preceding installation. Such a harsh, unreasonable and inflexible rule is without support in either our law or jurisprudence and, in our opinion, is to be avoided in the absence of statute expressly so providing.
Adverting now to consideration of the question whether the defect in question was patent or discoverable upon ordinary and reasonable inspection, the record discloses the tank was covered with a heavy coating of tar as previously noted. Having rested on the ground for several days at a construction site, the bottom of the tank was covered to some degree with mud at the place where the leak was ultimately discovered. Assuming the defect existed prior to the tank being placed in the excavation, Petrochem could not have discovered the defect unless the tank were raised from the ground and a careful examination made of the bottom after the mud thereon was scraped away. Even so, it is not certain the leak would have been discovered for, although photographs in evidence establish an obvious crack in the welded seam when the tank was unearthed, it also appears that the tar coating at the site of the hole had been dissolved by gasoline thus exposing the opening in the weld. As contended by counsel for Murphy, the record does not disclose that the defect, if it existed prior to installation of the tank, was either patent or one discoverable on reasonable inspection. Nothing in the record justifies the conclusion it was reasonable to require Petrochem to raise the tank and minutely inspect all welds and seams prior to lowering it into the hole.
Resolving the possibility that Petrochem's subcontractor damaged the tank when lowering it into the excavation, the record is barren of testimony to support such a conclusion. From the record, it appears the tank could have been damaged by any one or more of several persons or in divers ways as explained by the witnesses.
In disposing of appellant's contention the doctrine of res ipsa loquitur is applicable thus thrusting upon defendants the burden of exculpation, we note that on plaintiff's main demand there were only two defendants, namely, Petrochem and Rheem, one of whom (Rheem) has been exonerated by appellant. Since it has not been established that the damage occurred while the tank was in possession of the remaining defendant, Petrochem, the doctrine of res ipsa loquitur cannot apply to that litigant. Appellant's contention the doctrine of res ipsa loquitur is applicable to its claim against Southern will be considered in our disposition of Petrochem's reconventional demand against Murphy.
In defense of the reconventional demand asserted against it, Murphy first contends it was not contractually obligated to reimburse Petrochem the expenses incurred in removing the defective tank and installing its replacement. The record shows these expenses far exceed the initial contract cost because the removal and replacement of a tank in close proximity to one still in use involves certain perilous conditions not attending the original installation. Due to these circumstances, which it is unnecessary to relate, the entire removal and replacement procedure had to be performed *724 with hand tools and without the aid of machinery. In addition, defendant in reconvention maintains it is entitled to invoke the doctrine of res ipsa loquitur against both Petrochem and Southern, therefore (1) if Petrochem is unable to exonerate itself the reconventional demand should be rejected, but (2) if Petrochem exculpates itself, Southern should respond to defendant in reconvention for any amount recovered by Petrochem on its reconventional demand.
Cited in support of appellant's contention the doctrine of res ipsa loquitur applies to multiple defendants are the cases of Gerald v. Standard Oil Co. of Louisiana, 204 La. 690, 16 So.2d 233; Meyer v. St. Paul-Mercury Indemnity Co., La.App., 61 So.2d 901 and Arrington v. Hearin Tank Lines, La. App., 80 So.2d 167.
The cases cited are authority for application of the doctrine of res ipsa loquitur to multiple respondents under the respective circumstances involved in each instance. Our perusal of the quoted authorities reveals nothing suggestive of the proposition that the law respecting the doctrine of res ipsa loquitur as applied to multiple defendants differs in any manner from those instances wherein it is invoked against a single respondent. It is now well established in our jurisprudence that in order for the principle or rule of res ipsa loquitur to apply it must be shown (1) that the circumstances attending the accident were such as to create an inference of negligence on the part of the defendant; (2) control and management of the instrumentality responsible for the damage or injury was vested exclusively in the defendant; and (3) plaintiff was not in a position to know the particular circumstances which caused the instrumentality concerned to operate to his injury whereas defendant, being in such position, possessed superior knowledge or means of information regarding the cause of the mishap. Dorman v. T. Smith & Son, 223 La. 29, 64 So.2d 833.
In the present case it was not shown that any defendant had exclusive control and management of the tank when it was damaged. Indeed there was a period of one week when the tank was located on premises of Food Town, whom Murphy has held harmless by replacing the damaged tank and reimbursing Food Town's loss of profits. We do not imply that the tank was damaged during the week when it was in possession of Food Town or Murphy. But since it has not been shown that the damage to the tank occurred while it was in possession of any of the defendants, res ipsa loquitur may not be applied and no inference of negligence arises.
Whether Murphy and Petrochem contracted for the latter's service to remove the defective tank and replace it with one in good condition is a matter in dispute. Mr. Metranga, of Petrochem, testified he and Mr. Jecha, of appellant corporation, prior to unearthing the tank, agreed that if the leak were found to be in the piping, Petrochem would bear the expense of replacement whereas if the leak were found to be in the tank itself such cost would be appellant's responsibility. Mr. Jecha acknowledged Metranga's assumption of responsibility on behalf of Petrochem in the event the difficulty proved to be defective piping. He contended, however, nothing whatsoever was said or agreed with respect to who would defray replacement costs should the leak be found to result from a faulty tank. In view of our finding that Petrochem was not responsible for the faulty tank and was not therefore liable for its replacement, it is immaterial whether any agreement was reached between Murphy and Petrochem with respect to liability for replacement in the event the tank were found to be defective. It is undisputed that Murphy arranged for Petrochem to remove the defective tank and install a replacement. Under such circumstances, Petrochem is entitled to recover for its work on a quantum meruit. Bouterie v. Carre, La.App., 6 So. 2d 218. No serious question has been raised with respect to the amount awarded by the *725 trial court on Petrochem's reconventional demand. Our review of the record discloses the sum granted is substantiated by the evidence.
The views herein expressed obviate the necessity of adjudicating the plea of prescription filed by Southern.
Accordingly, the judgment of the trial court is affirmed, costs to be paid by appellant Murphy Corporation.