487 So.2d 743 (1986)
HANNA-ABINGTON ALEXANDRIA, INC., Plaintiff-Appellant,
v.
BUDD CONSTRUCTION COMPANY, INC., Defendant-Appellee.
No. 85-181.
Court of Appeal of Louisiana, Third Circuit.
April 23, 1986.
Provosty, Sadler & Delaunay, David P. Spence, Alexandria, for plaintiff-appellant.
Gist, Methvin, H.B. Gist, Jr., Alexandria, for defendant-appellee.
*744 Before STOKER, DOUCET and FALKENHEINER,[*] JJ.
STOKER, Judge.
This is a suit for breach of contract for the construction of a parking lot with an asphalt surface. Plaintiff contends the defendant contractor, Budd Construction Company, Inc. (Budd), breached its warranty of good workmanship. After construction, the surface of the parking lot began to crack and deteriorate. Budd answered plaintiff's suit, denied any liability and specifically alleged that factors other than poor workmanship were responsible for the failure in the parking lot. Budd also reconvened alleging first that Budd and plaintiff, Hanna-Abington Alexandria, Inc., entered into a compromise agreement affecting plaintiff's demands, in which Budd agreed to do additional work in the nature of repair. The repair work was estimated to cost approximately $9,000 which would be split between the parties. Budd alleged that it satisfactorily performed such work. Budd pleaded the performance of the agreement to repair constituted a transaction and agreement. He further pleaded that, if the compromise was not effective, the cost of the actual additional work done was approximately $19,563.25, for which Budd demanded recovery, plus 15% profit. Plaintiff filed a general denial with respect to Budd's reconventional demands.
After trial the trial court rejected the demands of both plaintiff and reconvenor. Hanna-Abington Alexandria, Inc. applied for a new trial which was denied; it then applied for a devolutive appeal to this court. Budd neither appealed nor answered the appeal. We affirm the trial court.
The distinguished trial judge who decided this case wrote excellent written reasons for judgment. After study of the record we find that the trial court's findings are correct, and its resolution of the case is proper. We adopt the trial court's reasons for judgment as our own opinion in this case. We set forth those reasons in full as follows:

"REASONS FOR JUDGMENT
"The plaintiff, Hanna-AbingtonAlexandria, Inc. (hereinafter Hanna), seeks to recover damages from the defendant, Budd Construction Company, Inc. (hereinafter Budd), arising out of the allegedly defective construction by the defendant of a parking lot at plaintiff's automobile dealership in Alexandria, Louisiana. It is conceded by both parties that the asphalt began to crack and show signs of failure within about 60 days of completion and that by the time of trial approximately four years later, the failure had progressed to the point that the entire area must be torn up and replaced.
"Essentially, plaintiff contends the asphalt failed either because: (1) the six inches of base material underneath was not sufficiently stable or (2) the base material was not properly compacted before the asphalt was laid. Plaintiff's position is that there were no plans and specifications supplied by the owner [plaintiff itself], nor was there any supervision by an architect, engineer or other expert, and hence the contractor is liable for bad workmanship within the meaning of LSA-C.C. art. 2762.
"Defendant contends essentially that in his bid he contracted only to `grade, shape and compact existing sand, clay and gravel' and to place two inches of hot mix asphalt on this base. Budd's position is that he performed exactly his contract, that the cause of the failure was not enough sand and too much clay in the existing base material, a condition which he did not know and was not reasonably required to know. Budd also argues that Hanna did not depend on Budd's expertise as to the base, but instead depended on its own engineer and laboratory soil analysis.

"GENERAL FACTS
"In 1978 Hanna constructed new buildings, driveways, parking areas, etc. under *745 the supervision of architects and engineers. The original specifications required six inches of `sand, clay, gravel,' complying with Department of Transportation and Development specifications, be placed on all areas to be paved, including the so-called `front parking lot,' and the `rear parking lot.' During construction, the original plans were changed to delete paving of the rear parking lot in order to save money. The front parking lot was paved with asphalt, and the evidence shows it has held up with only the normal amount of failure. The rear parking lot was originally covered with gravel.
"In September of 1979 Hanna decided to blacktop the rear parking lot. Chris Tidwell, business manager of Hanna, solicited bids from Budd and from L.H. Bossier, Inc. Budd's bid dated October 8, 1979 states it would furnish all material, labor and equipment to perform the following work:
"`1. Grade, shape and compact existing sand, clay and gravel for the sum of 6,263 square yards at $0.65 $4,070.95.
2. Prime and place two inch hot mix asphalt for the sum of 6,263 square yard at $3.55 $22,233.65.'"
"Budd's bid for the work in question totaled $26,304. Mr. Tidwell testified that Bossier's bid was over $40,000. Tidwell called Bossier to find out why its bid was so much higher. Bossier explained that it proposed to use lime or soil cement in the base material. Other testimony shows that the purpose of using lime or soil cement is to reduce the PI (plasticity index) of clay, which, if untreated shrinks when dry and expands when wet, thus causing the base to be unstable.
"Tidwell consulted with Mr. Pete Abington, president of Hanna-Abington, about the difference in the bids. Abington decided to seek advice from the engineering firm, Meyer, Meyer, Lacroix and Hixson, Inc., who had performed the engineering services in connection with the original construction in 1978. Mr. Dudley Hixson, of this engineering firm, decided to obtain a soil test from Louisiana Testing and Inspection, Inc. This testing concern reported to Hixson first orally and then in writing on October 29, 1979 as follows:

"`Sample Number Depth Description LL- PL- Pi
 1 3' Stiff Reddish 36 20 16
 Brown Silty Clay
 2 3' Stiff Reddish 40 21 19
 Brown Silty Clay
 3 3' Stiff Reddish 39 21 18
 Brown Silty Clay
 4 3' Stiff Reddish 39 22 17
 Brown Silty Clay

"Remarks: Alternative # 1
"This is a suitable subbase material. It would also be suitable as a base if Lime treated & stabilized with cement 72 hr. prior to Lime stabilization. Lime Factor Recommendation 10% by Volume.
Cement Factor Recommendation10% by Volume.
Alternative # 2
Scarify the existing Sand Clay Gravel & compact by means of a Sheep Foot Roller. Material should be compacted at optimum moisture until the specified percent compaction is reached. Thickness of Asphlatic Concrete Surfacing for Alternatives 1 & 2 should be at least 2.5" thick.'
"By a letter dated October 30, 1979, Hixson forwarded to Hanna a copy of the above soil test report. In this letter, Hixson states the following:
"`I have received a verbal report from the laboratory regarding the suitability of the existing base material. Mr. Charlie Humphries reported to me that the material is of sufficient thickness and quality to be utilized as a satisfactory base. His recommendation, which will be included in a written report, is to scarify the existing base material, add water through use of a sprinkler truck, and compact to optimum density.
`His recommendation also includes placing a minimum 2½ inch thick hot mix asphalt over the prepared base. Any existing quotations which you may now have should be revised to include the foregoing recommendations. A laboratory should be utilized to insure satisfactory *746 compaction of base material prior to placement of the asphalt.'
"On receipt of Hixson's letter and the attached soil test report indicating existing materials would make a satisfactory base, Hanna decided to accept Budd's bid which proposed to use existing base materials and not add lime. Tidwell testified that in discussing Hixson's letter and recommendations with Budd, he pointed out that Hixson recommended two and one-half inches of asphalt, whereas Budd's bid proposed only two inches. Tidwell testified he was advised by Budd that the thickness of the asphalt would probably not be precise and would be close enough to two and one-half inches to be satisfactory. As to Hixson's recommendations that a laboratory should be utilized to insure satisfactory compaction of base material prior to placement of the asphalt, Tidwell testified he did not realize the importance of this and did not discuss it with Budd.
"There is a dispute as to whether Hanna contacted Hixson before or after soliciting the bids from Budd and from Bossier. The Court is of the opinion a preponderance of the evidence shows that Hanna did not contact Hixson and did not receive the Louisiana Testing Soil Report until after the bids were submitted. Tidwell testified positively to this effect, and the dates of the bids, the report by Louisiana Testing and the letter from Hixson corroborate this sequence of events.
"There is also a dispute as to whether Budd was informed before or after he submitted his bid that six inches of sand, clay, gravel existed and would be a sufficient base. Tidwell testified that all he did with both Budd and Bossier was show them the area to be asphalted and ask them to submit bids. Moreover, Tidwell testified that after the bids had been submitted and Hanna had obtained the soil test and Hixson's letter, he did not inform Budd about the soil test. However, Budd testified that he was informed either by Tidwell or from some other source that six inches of sand, clay and gravel existed and would be a sufficient base. Budd does not contend that he ever saw the soil test report by Louisiana Testing or that he saw or was informed of Hixson's letter recommending further compaction tests during construction.
"Budd started work on November 7, 1979. He testified he first used a motor grader to scarify and shape the top three inches, and then he compacted it with a roller. Budd said he had been informed, and therefore assumed, that the top six inches was sand, clay, gravel, which was a sufficient base for the asphalt. He did no testing to determine the exact proportions of sand, clay, gravel. They finished preparing the base on November 15, 1979, but then a two-week interval elapsed before Budd started laying the asphalt on November 19, 1979. Budd finished the job during the early part of December, 1979. Tidwell inspected it and found it to be suitable and paid Budd in full.
"Within 45 to 60 days, the first cracks appeared in the asphalt. Hanna called Budd who did some patch work in February of 1980. During the next several months the asphalt continued to crack. Beginning in November of 1980, a series of meetings were held between the owners, Mr. Budd and Hixson. As a result of these meetings, Gorsha Testing Laboratories made tests during January of 1981 in an effort to determine the cause of the asphalt failure. These tests showed that the earlier report by Louisiana Testing that a satisfactory sand, clay, gravel base existed for a depth of six inches was not correct. Essentially, these tests showed that the six inches of base material was a reddish brown silty clay with gravel. There was insufficient sand. This material was unstable due to excessive moisture content and plasticity.
"Following Gorsha's report which indicated that the cause of the asphalt failure was unsatisfactory base material, the parties entered into a compromise agreement during April of 1981, whereby Budd would repair those areas of asphalt marked by Hixson with yellow paint, and Hanna-Abington would pay Budd $4,250. Budd *747 started these repairs and expended about $19,000, before it became apparent that patching would not solve the problem. Budd abandoned, without completing, his obligations under the compromise agreement, and Hanna did not pay Budd the $4,250. This suit followed.
"The trial started during June of 1983, but was not completed and briefed until March of 1984 because counsel for Hanna-Abington was injured in an accident. Mr. Hixson, a witness for the plaintiff, qualified as an expert in construction engineering but not in soil analysis. Hixson stated he relied on the report by Louisiana Testing that the existing material constituted a suitable base. He could not determine from this report the actual percentage of content of each ingredient in the base material. However, having been one of the engineers for the original construction in 1978, he assumed the specification requiring a sand, clay, gravel fill had been met. Hixson recognized that the soil analysis made by Louisiana Testing differed substantially from that made by Gorsha after the asphalt failed, but he offered no explanation as to the reason for this difference, except the `luck' of locating the test borings.
"Hixson concluded by expressing the opinion that the asphalt cracked due to failure of the base, which could have been caused by: (1) insufficient compaction of the base material before laying the asphalt; (2) uneven distribution of the base material causing some areas to be weaker and more unstable than others; (3) failure to obtain optimum moisture of the base material during compaction.
"Testifying for Budd was Dr. Louis J. Capozzoli, a highly qualified soil engineer who, as reported decisions show, has testified in many previous cases involving soil analysis. He personally visited the parking lot and reviewed the tests run by Louisiana Testing and by Gorsha. He noted that the Louisiana Testing report described the base material to a depth of three inches as `stiff reddish brown silty clay,' rather than `sand, clay, gravel.' Capozzoli stated that Hixson could not tell from this report that there was six inches of sand, clay, gravel, or that the percentages of these materials met the Department of Transportation and Development standards. Of course, in deference to Hixson, the Court notes he relied on the conclusion by Louisiana Testing that the base material was adequate, and in addition, as an extra precaution, he recommended further laboratory tests of the base material during construction. Of course, the owner did not require and no one performed these tests during the work.
"It was Capozzoli's opinion, largely from the Gorsha tests, that the base material did not contain enough sand to meet the DOTD standards for `sand clay gravel.' The Gorsha report showed that the material was reddish brown clay, which was unsuitable because of the excessive plasticity of the clay. When moisture intruded the clay, it expanded and caused the asphalt to crack. It was Capozzoli's opinion, that the Louisiana Testing report concluding that the existing base material was satisfactory is simply wrong.

"THE APPLICABLE LAW
"Plaintiff relies on LSA-C.C. art. 2762 which provides as follows:
Art. 2762. Liability of contractor for damages due to badness of workmanship
Art. 2762. If a building, which an architect or other workman has undertaken to make by the job, should fall to ruin either in whole or in part, on account of the badness of the workmanship, the architect or undertaker shall bear the loss if the building falls to ruin in the course of ten years, if it be a stone or brick building, and of five years if it be built in wood or with frames filled with bricks.
"Although Article 2762 refers only to a `building,' jurisprudence has extended its application to a swimming pool, Unverzagt v. Young Builders, Inc., 207 So.2d 405 (La.App. 3rd Cir.1967 [(252 La. 1091), 215 So.2d 823 (La.1968)]; an underground gasoline tank, Murphy Corporation v. Petrochem Maintenance, Inc., 180 So.2d 716 *748 (La.App. 1st Cir.1965 [writ denied (248 La. 910), 295 (182) So.2d 662 (La.1966)], and street paving, Town of Winnsboro v. Barnard and Burk, Inc., 294 So.2d 867 (La. App. 2d Cir.1974) [writ denied, 295 So.2d 445 (La.1974)], and Don Seibarth [Siebarth] Pontiac v. Asphalt Road Building, 407 So.2d 42 (La.App. 3rd Cir.1981). Under these cases, Article 2762 clearly applies to the construction of an asphalt parking lot.
"In Worst [Wurst] v. Pruyn, 250 La. 1109, 202 So.2d 268 (La.1967) our Supreme Court construed the meaning of `badness of workmanship' under Article 2762. The facts were that the concrete slab of a home cracked due to the shrinking of the soil beneath the slab caused by large trees absorbing the water from the soil. In a detailed discussion of the sources and construction of Article 2762, the court held:
`Although the French Codal Article (C.N.1792), from which Article 2762 of our Civil Code was derived, provides that the undertaker is responsible for loss occasioned by "defects in the soil", this provision of the French Code was omitted from Article 2762. In keeping with the omission, Louisiana's jurisprudence has long recognized that the undertaker under Article 2762 is not responsible for "defects in the soil". Under our law, therefore, unlike the French law, to hold the undertaker liable, the owner must show that the ruin was due to badness of workmanship or defective materials. Brasher v. City of Alexandria, 215 La. 887, 41 So.2d 819 (1949); Powell v. Markham, 18 La.Ann. 581 (1866); Freemont v. Harris, 9 Rob. 23 (1844); Code Napoleon, art. 1792; Comment, 7 La.L.Rev. 564 (1947); Rogron, Les Codes Francais ExpliquesDroit Civil, p. 333, art. 1792 (3rd ed. 1847); 2 Planiol, Traite Elementaire De Droit Civil, n 1916 (11th ed. 1939).
While undertakers and architects under Article 2762 are held harmless for "defects in the soil", it is latent defects in the soil which are meant. Hence a different result would obtain if the soil defect was apparent to the undertaker. And it could not be otherwise, unless a contractual stipulation governed the question. For the requirements of public order and the obligation implicit in every contract that the work will be done in a good and workmanlike manner would compel us to reject a contention that an undertaker is not responsible for building upon a site which he knows to be defective. In such a case, the barest standards of care would require him to bring the defect to the attention of the owner before proceeding. The owner would then have an opportunity to make the indicated adjustment in the contract to provide against the defective soil condition of which he had no prior knowledge. Matthews v. Rudy, 4 La.App. 226 (1926).
Not only do we think Article 2762 imposes liability upon an undertaker who builds upon a site he knows to be defective, but we are also of the opinion he is liable for the loss resulting from a structure falling into ruin when he should have known by the exercise of proper judgment that a condition at the site, other than a latent defect in the soil, should be corrected before proceeding with the work, and he fails to advise the owner in time to permit an adjustment. This is an obligation of the undertaker which seems plain to us. Draube v. Rieth, 114 So.2d 879 (La.App.1959). For the contractor has expert knowledge of such things, or should have, and he must bring these things to the attention of the owners, who have no knowledge of such affairs. See Jung v. Gwin, 174 La. 111, 139 So. 774 (1932).
Thus in the instant matter, where the soil was entirely adequate when the work began but failed because the structure was built too near to too many trees, we do not have the case of a soil defect such as was recognized in Freemont v. Harris, 9 Rob. 23 (1844) and Powell v. Markham, 18 La.Ann. 581 (1866) and the other cases involving latent soil defects which were held to exonerate the undertaker. Here the soil was fine. It was the method of building, the lack of foresight in *749 the workmanshipthe failure to know what would surely happenwhich caused the structure to fall to ruin. In short, it was "on account of the badness of the workmanship" that the soil was dried out by the trees and rendered unsuitable for supporting the Wurst house.'
"Another case which gives insight into the meaning of `badness of workmanship' under Article 2762, is Murphy Corporation v. Petrochem Maintenance, Inc., 180 So.2d 716 (La.App. 1st Cir.1965) [writ denied (248 La. 910), 182 So.2d 662 (La. 1966)]. The facts were that a 10,000 gallon underground gasoline tank furnished by the owner and installed by the contractor at a gas station had a defective weld on the bottom. After installation, the tank leaked gasoline. In an opinion absolving the contractor of liability under Article 2762, the court held:
`We believe the duty thus imposed extends, in cases where materials are furnished by the owner, to defects which are either patent or discoverable upon ordinary and reasonable inspection by the contractor, due regard being given in each instance to the contractor's greater opportunity to notice or discover defects or, through his superior and technical knowledge, to recognize the suitability of the material. We do not consider that the law makes the contractor the absolute guarantor of the quality of materials furnished by a proprietor. To do so would impose upon the contractor the unconscionable and unreasonable burden of submitting to minute and highly technical test and examination each and every component of any material, device, equipment or apparata furnished him by the owner for incorporation into a work or project. Such a rule would impose upon the contractor the duty of inspecting for and guarding against any and all latent defects in manufacture as well as any hidden or not reasonable discoverable damage occurring while the material, equipment or apparata is in the possession of the owner preceding installation. Such a harsh, unreasonable and inflexible rule is without support in either our law or jurisprudence and, in our opinion, is to be avoided in the absence of statute expressly so providing.
Adverting now to consideration of the question whether the defect in question was patent or discoverable upon ordinary and reasonable inspection, the record discloses the tank was covered with a heavy coating of tar as previously noted. Having rested on the ground for several days at a construction site, the bottom of the tank was covered to some degree with mud at the place where the leak was ultimately discovered. Assuming the defect existed prior to the tank being placed in the excavation, Petrochem could not have discovered the defect unless the tank were raised from the ground and a careful examination made of the bottom after the mud thereon was scraped away. Even so, it is not certain the leak would have been discovered for, although photographs in evidence establish an obvious crack in the welded seam when the tank was unearthed, it also appears that the tar coating at the site of the hole had been dissolved by gasoline thus exposing the opening in the weld. As contended by counsel for Murphy, the record does not disclose that the defect, if it existed prior to installation of the tank, was either patent or one discoverable on reasonable inspection.'
"In Don Siebarth Pontiac, Inc. v. Asphalt Road Building and Resurfacing, Inc., 307 [407] So.2d 42 (La.App. 3rd Cir. 1981), a case similar to the present matter, an automobile dealer contracted with the defendant for the construction of an asphalt parking lot in Calcasieu Parish. The owner did not seek the advice of either an engineer or a testing laboratory. He simply showed the contractor the area to be paved and they agreed on a price. They discussed using a soil cement base, but the contractor advised the existing soil would be suitable. After construction, the asphalt cracked due to failure of the base. The court held:
`At the outset, we reject defendant's contention that it was not responsible for *750 the failures in the sub-base because it did no work on the sub-base nor did it warrant the sub-base in any manner. As pointed out by the trial judge, a builder is obliged to construct work that is suited for its intended purpose. Stated another way, it is implicit in every building contract that the work will be performed in a good, workmanlike manner free from any defects in materials or workmanship. LSA-C.C. art. 2762. Furthermore, a contractor is liable when he should have known by the exercise of proper judgment that the condition at the site, other than a latent defect of soil, should be corrected before proceeding with the work and he fails to advise the owner in time to permit an adjustment. He is considered as having expert knowledge of such things and must bring them to the attention of the owners who have no knowledge of such affairs.'
"In Siebarth, the evidence was clear that the owner relied absolutely on the expertise of the contractor. Moreover, there was apparently no factual issue as to whether the composition of the base material was such that the contractor knew or should have known it was not suitable. The evidence was clear that without soil cement the base would not be satisfactory.
"Before discussing the question of whether Budd should have known that the base material was unsatisfactory, the Court notes that in the present case, unlike Siebarth, the owner did not rely on Budd's expertise to determine whether the base was adequate. When Hanna received the bids from Budd and from Bossier, it decided to seek expert advice on which of these two bids to accept. Hanna employed an engineer, Hixson, who in turn secured a soil test from Louisiana Testing. As shown above, Louisiana Testing reported that the existing base material was satisfactory. Hixson relied on this soil test to advise Hanna to the same effect. On receipt of this expert advice, Hanna awarded the contract to Budd. Thus, Hanna did not rely on Budd's expertise as to the base material, but instead relied on the advice of its own experts.
"The next question is whether Budd should have known that the base was not satisfactory. Plaintiff points to the testimony of Mr. Hixson that Budd could have determined by simply using a shovel and digging down a depth of six inches that the soil contained too much clay and not enough sand. On the other hand, Budd argues persuasively that if Louisiana Testing, an expert in soil analysis, could not determine from its laboratory tests and if Hixson could not determine from the report of those tests, that the existing base material was unsatisfactory, how could an asphalt contractor determine this by mere observation on the job.
"Of course, in this case, as in all civil cases, the plaintiff had the burden of proving that Budd was guilty of badness of workmanship, which, as applied to the circumstances, means that plaintiff had the burden of proving that Budd should have discovered the unsatisfactory base and should so have advised the owner. Each of these cases depends on its own facts. Considering all of the facts, the Court is of the opinion that plaintiff has failed to prove by a preponderance that Budd knew or should have known the base was insufficient. It follows that Budd had no duty to advise Hanna of the unsatisfactory base.
"In its brief, Budd argues its reconventional demand for $4,250 under the compromise agreement. Since Budd did not comply with this agreement, he cannot demand performance by Hanna.
"For the reasons assigned, the Court is of the opinion that there should be judgment herein in favor of the defendant and against the plaintiff, dismissing the demands of the plaintiff at its costs...."
At oral argument, counsel for Hanna-Abington argued that Hixson and Capozzoli testified that the composition of the existing base was adequate if properly prepared before asphalting. He further argued that the trial judge was misguided in holding the base was not of the proper composition and, hence, the opinion based on that holding was off the mark. Plaintiff's counsel *751 indicated that the court placed too much emphasis on DOTD standards for sand, clay, gravel and appeared to base its finding of inadequacy on failure to meet the DOTD standard.
We find the trial court's decision fully supported by the trial record. While at one point testifying that the existing base was adequate, Hixson's testimony was somewhat equivocal. He ultimately stated that failure of the parking lot could have been caused by other improper preparation or inadequate base. Hixson's testimony could be construed to be that of an interested party since he did in fact recommend the method of preparation used based on what Capozzoli said was an inadequate soil testing report. In addition, as noted by the trial judge, he was not qualified as a soils expert but as a construction expert.
We believe the trial court properly relied on the testimony of the soils expert, Capozzoli. We do not find that the trial court placed any improper significance on DOTD standards. The following exchange at trial indicates the court's decision is well supported by the record:
"Q Dr. Capozzoli, do you agree with the conclusions reached in the Louisiana Testing report, Alternatives 1 and 2, that the base that was there was suitable for overlay with asphalt?
A No.
Q Why not?
A Pardon me, conclusion 1, Alternative 1? [Alternative 1 was stabilization by addition of lime.]
Q Yes.
A Uh ... pretty close, yes. Alternative 2, sand, clay, gravel ... no way. [Alternative 2 was scarification and compaction of existing sand, clay, gravel]
Q Because there wasn't any sand, clay, gravel there, is that right?
A You don't have it. If you had it there I wouldn't argue with them if it met the specifications, I wouldn't argue, but it's not there.
Q But the laboratory thought it was there.
A All I can say is that that laboratory technician or technicians went out to the field, got samples of the total three foot depth of material in a bare hole, they were looking for a base material by the stating ... looking for lime and cement factors in sand, clay, gravel. He brought it back to his laboratory, he had it in his hands. I don't know how he could call that sand, clay, gravel. The absence of sand should have been apparent to a soil technician with any experience whatsoever. I'm not saying he could have told by looking at it whether it was silt or clay, but sand particles are visible to the naked eye. He should be able to tell if he had it in his hands, which was his job to do. Mr. Hixson said go out, take me four borings, tell me what's there. He didn't tell Mr. Hixson or anyone else what was there.
Q As an engineer, would that written report have been acceptable to you?
A I would not have accepted it. I'd want more information. Thicknesses and quality of material ... quantities... quantities and thickness, and quantitative classification. The Highway Department didn't make these specifications just on their whim. They've got many, many years of experience behind them. That's why they set them up."
Capozzoli's testimony clearly provides that in his expert opinion the material that was used as a base course was not adequate.
For the foregoing reasons, the judgment of the trial court is affirmed. The costs of this appeal are assessed to appellant, Hanna-Abington Alexandria, Inc.
AFFIRMED.
NOTES
[*] W.C. Falkenheiner, Seventh Judicial District Court, Parish of Concordia, participated as Judge ad Hoc in this decision.