583 So.2d 883 (1991)
HALLAR ENTERPRISES, INC.
v.
David S. HARTMAN, Jr. and Hartman Enterprises, Inc.
No. 90 CA 0914.
Court of Appeal of Louisiana, First Circuit.
June 27, 1991.
*884 F. Charles Marionneaux, Plaquemine, for plaintiff.
Charles A. Schutte, Jr., Baton Rouge, for defendant Commercial Union Ins. Co.
Maurice P. Mathieu, Houma, for defendants David S. Hartman and Hartman Enterprises, Inc.
Jess J. Waguespack, Napoleonville, for defendants Hartman and Hartman Enterprises, Inc.
Before LOTTINGER, SHORTESS and CARTER, JJ.
LOTTINGER, Judge.
This is an appeal from a judgment in a suit for breach of contract for the resurfacing of a limestone road with hot mix asphalt. The plaintiff, Hallar Enterprises, Inc. (Hallar), sued the defendants, David S. Hartman, Jr. and Hartman Enterprises, Inc. (Hartman), when a private road owned by Hallar failed shortly after it was resurfaced by Hartman. Hartman filed a third party demand against its insurer, Commercial Union Insurance Company (CU), after CU denied coverage and refused to provide Hartman with a defense. Hallar later added CU as a defendant in the main demand.
After a trial on the merits the trial court found that Hartman was not responsible for the failure of the road, and that CU had a duty to defend Hartman pursuant to its insurance policy. A judgment was rendered in favor of Hartman and CU on the main demand, and in favor of Hartman on the third party demand, dismissing Hallar's suit and awarding attorney's fees to Hartman from CU. Hallar and CU both appeal from this judgment.

FACTS
The road at issue is a one thousand foot long private road that connects La. Highway 70 with a well site near Pierre Part, Louisiana. It was originally constructed by an oil company in 1980 and surfaced with limestone to facilitate the drilling of an oil well. Soon after the road was constructed, Mr. Albert Aucoin, the mineral lessor, took over the maintenance of the road and regularly graded it by dragging a rail over it. After several months of drilling, the well was plugged and abandoned by the oil company.
Sometime in 1981, Mr. Aucoin formed Hallar Enterprises, Inc. Hallar reworked the well and began operating it as a saltwater injection well[1] in February 1982. To *885 counteract the effects of subsidence, Hallar added four additional truckloads of limestone to the road shortly after it began operations. Thereafter, Hallar continuously maintained the road as Mr. Aucoin had by regularly grading it with a rail.
In October of 1984, Mr. Aucoin, acting on behalf of Hallar, contacted Mr. Hartman about surfacing the road with asphalt. Mr. Aucoin told Mr. Hartman that the primary reason he wanted the road surfaced was to cut down on the dust. He told Mr. Hartman that he had never had any problems with the road since it was built and that it had a good base. He estimated that an average of twelve to fourteen heavy trucks used the road daily and that the road withstood this traffic with no problems. He indicated to Mr. Hartman that there were never any pothole or subsidence problems with the road since it was constructed.
Relying on a visual inspection of the road, and Mr. Aucoin's representations as to the volume and weight of the traffic using the road for over two years and its history of a complete absence of potholes or subsidence, Mr. Hartman concluded that the base of the road was sufficient to support the asphalt overlay without any additional work besides grading and shaping. Mr. Aucoin asked if soil cement[2] was needed, and Mr. Hartman replied that soil cement is not used on limestone roads.
Mr. Hartman then agreed to grade and shape the existing road base and overlay it with three inches of asphaltic concrete. The job was completed in October of 1984, and within several months the road began to fail. The experts who testified at trial all agreed that the cause of the failure was an insufficient base under the asphalt. They were all of the opinion that the asphalt itself met the pertinent specifications and was properly put down.
All of the experts testified that from an engineering point of view,[3] it was never appropriate to overlay a road without testing the base by taking core samples. They agreed that it was impossible to determine the sufficiency of the base by a visual inspection of the surface alone. They also testified that it was usually not the contractor's responsibility, but rather the owner's or road building authority's responsibility to hire an engineer or otherwise test the sufficiency of the base.
All three experts also agreed that given the condition of the base and the volume and type of traffic using the road, it must have been failing, i.e. continually subsiding and developing potholes, prior to being overlaid with asphalt. They testified that if this was not apparent from a visual inspection it was because the road was continuously graded, and in effect continuously repaired, so that the defects were not obvious.

THE MAIN DEMAND: HARTMAN'S LIABILITY TO HALLAR
After a trial on the merits the trial court held that Hartman was not responsible for the failure of the road because he did not build or agree to strengthen the base, because Mr. Aucoin represented that the base was adequate, and because there were no apparent defects in the base. The trial court further found that Mr. Aucoin had enough knowledge about road building to retain the services of an engineer if he desired one.
Hallar appeals, relying on La.Civ.Code art. 2762 and several cases interpreting it. This article provides:
If a building, which an architect or other workman has undertaken to make by the job, should fall to ruin either in whole or in part, on account of the badness of the workmanship, the architect or *886 undertaker shall bear the loss if the building falls to ruin in the course of ten years, if it be a stone or brick building, and of five years if it be built in wood or with frames filled with bricks.
Although this article refers only to a "building," the jurisprudence has extended its application to include the surfacing of streets and parking lots with asphalt. Hanna-Abington Alexandria, Inc. v. Budd Construction Company, 487 So.2d 743 (La.App. 3rd Cir.1986); Don Siebarth Pontiac, Inc. v. Asphalt Road Building and Resurfacing, Inc., 407 So.2d 42 (La. App. 3rd Cir.1981); Town of Winnsboro v. Barnard & Burk, Inc., 294 So.2d 867 (La. App. 2nd Cir.), writ denied, 295 So.2d 445 (La.1974).
With respect to defects in the soil, or as in this case a defect in the existing base of the road to be overlaid, article 2762 imposes liability upon a contractor only for building upon a site that he knew or should have known was defective. The contractor is liable only for failing to correct or disclose obvious or apparent soil defects and not latent or hidden defects. Wurst v. Pruyn, 250 La. 1109, 202 So.2d 268 (La.1967). In Wurst, the Supreme Court held:
While undertakers and architects under Article 2762 are held harmless for "defects in the soil", it is latent defects in the soil which are meant.
....
Not only do we think Article 2762 imposes liability upon an undertaker who builds upon a site he knows to be defective, but we are also of the opinion he is liable for the loss resulting from a structure falling into ruin when he should have known by the exercise of proper judgment that a condition at the site, other than a latent defect in the soil, should be corrected before proceeding with the work, and he fails to advise the owner in time to permit an adjustment.
Wurst, 202 So.2d at 271-72 (emphasis added).
The duty imposed upon a contractor under article 2762 with respect to defective materials furnished by the owner, in this case the defective road base, is also relevant to this appeal. In Murphy Corporation v. Petrochem Maintenance, Inc., 180 So.2d 716 (La.App. 1st Cir.1965), writ denied, 248 La. 910, 182 So.2d 662 (1966), the extent of that duty was at issue. There we held:
We believe the duty thus imposed extends, in cases where materials are furnished by the owner, to defects which are either patent or discoverable upon ordinary and reasonable inspection by the contractor, due regard being given in each instance to the contractor's greater opportunity to notice or, discover defects or through his superior and technical knowledge, to recognize the suitability of the material. We do not consider that the law makes the contractor the absolute guarantor of the quality of materials furnished by a proprietor. To do so would impose upon the contractor the unconscionable and unreasonable burden of submitting to minute and highly technical test[ing] and examination [of] each and every component of any material, device, equipment or apparata furnished him by the owner for incorporation into a work or project. Such a rule would impose upon the contractor the duty of inspecting for and guarding against any and all latent defects in manufacture as well as any hidden or not reasonably discoverable damage occurring while the material, equipment or apparata is in the possession of the owner preceding installation. Such a harsh, unreasonable and inflexible rule is without support in either our law or jurisprudence and, in our opinion, is to be avoided in the absence of [a] statute expressly so providing.
Murphy Corporation, 180 So.2d at 722-723.
Hallar, as the plaintiff in this case, has the burden of proving that Hartman was guilty of "badness of workmanship" under article 2762. It is clear from the evidence that the asphalt surface itself was properly laid and would not have failed but for the defective subsurface base, which Hartman was not hired to test or improve. Therefore, in order to prevail, Hallar has the burden of proving that Hartman, by exercising *887 proper judgment, should have discovered the insufficient base and corrected it or brought it to Hallar's attention.
Both the Hanna-Abington and Don Siebarth cases involved asphalt parking lots and roads at car dealerships that failed due to an insufficient base. They are instructive on the issue of whether a contractor, exercising proper judgment, should have discovered that the subsurface base was insufficient; or put another way, whether the defective soil condition was apparent, as opposed to latent, considering the contractor's expert knowledge and relationship to the job and the owner.
In Hanna-Abington, the owner hired an engineer to test the sufficiency of the base prior to the contractor overlaying the lot with asphalt. The testing firm employed by the engineer reported that the base consisted of six inches of sand, clay and gravel and was suitable for asphalt overlayment with only minimal preparation needed.
The contractor did not know specifically that the base had been tested or what the results of the test were, but was told that six inches of sand, clay and gravel (a sufficient base) existed at the site. The contractor followed the owners instructions pertaining to the minimal preparation of the base, and then put down the asphalt. Soon after the job was completed, the asphalt began to fail.
Subsequent testing revealed that the initial test was wrong and that the base contained an insufficient percentage of sand to meet the standard for sand, clay and gravel. These further tests revealed that the base was insufficient to support the asphalt without substantial improvement.
The plaintiff/owner contended that the contractor should have known that the base was insufficient because the lack of sand was readily apparent by simply digging six inches into the ground with a shovel. The contractor countered that if the engineer and specialized testing firm hired by the owner failed to discover the defective base after conducting tests thereon, then the contractor, who was not hired to do any base work and was told that the base was sufficient could not be expected to discover the defective base.
The trial court, after noting that the plaintiff did not rely on the contractor's expertise as to the sufficiency of the base but hired its own experts for this purpose, held that the contractor, who was told specifically that a sufficient base existed, was not liable for failing to discover the defective base. The Third Circuit adopted the reasons of the trial court and affirmed. Hanna-Abington, 487 So.2d at 744.
In Don Siebarth, the owner relied exclusively on the contractor to overlay the roads and parking lots at his car dealership with asphalt. Although the agreement between the owner and contractor did not specifically include subsurface work, the owner made no representations to the contractor about the sufficiency of the base.
The contractor performed no tests to determine the sufficiency of the base, yet told the owner that no subsurface work was needed and that the base was sufficient. Shortly after completion of the job the asphalt began to crack and deteriorate due to an insufficient base.
The Third Circuit, in Don Siebarth, held that under the circumstances the contractor should have known by the exercise of proper judgment that the base was insufficient. It should have tested the base and either improved it or informed the owner of its insufficiency. The contractor's failure to do so subjected it to liability to the owner for resurfacing the dealership.
The instant case is more analogous to the facts in Hanna-Abington, where the owner represented to the contractor that the base was sufficient, than to those in Don Siebarth, where the owner relied on the contractor to tell him if the base was sufficient. Here, Hallar specifically represented to Hartman that the base was sufficient. The road to be overlaid had been in existence for several years and showed no indications of an insufficient base even though it routinely supported a significant amount of heavy truck traffic. Hallar indicated that the primary reason it wanted the road asphalted was to control a dust problem.
*888 The trial court, after considering these circumstances, held that the defective condition of the base was latent and that Hartman was not liable for failing to discover it. We agree with the trial court's handling of this issue and affirm this portion of the judgment.

THE THIRD PARTY DEMAND: CU's DUTY TO DEFEND
Hartman's third party demand against its insurer, CU, alleged that CU breached its duty to defend Hartman from Hallar's suit. It is well settled that an insurer's obligation to defend suits against its insured is broader than its liability for damage claims. This duty to defend is determined by the allegations of the petition, and the insurer is obligated to furnish a defense unless the petition unambiguously excludes coverage. Meloy v. Conoco, Inc., 504 So.2d 833 (La.1987); American Home Assurance Co. v. Czarniecki, 255 La. 251, 230 So.2d 253 (1969).
In Czarniecki, the Louisiana Supreme Court fashioned the following test to determine if the insurer has a duty to defend its insured:
Thus, if, assuming all the allegations of the petition to be true, there would be both (1) coverage under the policy and (2) liability to the plaintiff, the insurer must defend the insured regardless of the outcome of the suit. Additionally, the allegations of the petition are liberally interpreted in determining whether they set forth grounds which bring the claims within the scope of the insurer's duty to defend the suit brought against its insured.
Czarniecki, 230 So.2d at 259.
Hallar alleged in its third supplemental and amending petition[4] that Hartman failed to construct the road in a manner sufficient to bear the traffic contemplated by the parties and the contract, that Hartman breached the warranties of fitness and good workmanship implicit in the contract, and that Hartman was negligent in the following respects:
1. Failing to adequately design the road to withstand the traffic for which it was intended;
2. Failing to warn Hallar of the consequences of building the road without prior subsurface preparation;
3. Furnishing Hallar with faulty advice relative to the building of the road;
4. Failing to provide a base of sufficient thickness to withstand the typical heavy traffic using the road;
5. Failing to provide adequate engineering services in connection with the building of the road.
Hallar alleged that Hartman's faulty construction, breach of warranties, and negligence resulted in the failure of the road, and that Hartman was liable for the cost of reconstructing the road, the cost of the tests conducted to determine the cause of the road failure, the cost of drafting the specifications required for the new road, and the loss of use of the road during the time that it is being reconstructed.
CU issued a special multi-peril property and liability insurance policy to Hartman, number FE W61 97 48, which was in full force and effect at all times pertinent to this litigation. That policy provides in pertinent part:
The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of ... property damage to which this insurance applies, ... and the company shall have the right and duty to defend any suit against the insured ... even if any of the allegations of the suit are groundless, false or fraudulent....
I. EXCLUSIONS:
This insurance does not apply: ... (n) to property damage to the named insured's products arising out of such products or any part of such products;...
* * * * * * *889 (3)[5] with respect to the completed operations hazard and with respect to any classification stated in the policy or in the company's manual as "including completed operations", to property damage to work performed by the named insured arising out of such work or any portion thereof, or out of such materials, parts or equipment furnished in connection therewith.
The definitions section of the policy contains the following definitions:
"completed operations hazard" includes bodily injury and property damage arising out of operations or reliance upon a representation or warranty made at any time with respect thereto, but only if the bodily injury or property damage occurs after such operations have been completed or abandoned and occurs away from premises owned by or rented to the named insured. "Operations" include materials, parts or equipment furnished in connection therewith....
"named insured's products" means goods or products manufactured, sold, handled or distributed by the named insured or by others trading under his name, including any container thereof (other than a vehicle), but "named insured's products" shall not include a vending machine or any property other than such container, rented to or located for use of others but not sold; ...
"property damage" means (1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period; ....
The trial court held that CU owed Hartman a duty to defend based on its finding that the petition did not unambiguously exclude coverage in at least two respects. The trial court held that accepting the allegations of the petition as true, there was coverage under CU's policy for the loss of use of the road while it was being repaired, and for Hartman's faulty engineering advice, faulty design, and failure to warn of the consequences of inadequate subsurface preparation.
In finding coverage under the policy for Hallar's loss of use of the road, the trial court held that the term "property damage" was not defined in the policy. Therefore, in accordance with Borden, Inc. v. Howard Trucking Company, Inc., 454 So.2d 1081 (La.1983), property damage, within the meaning of the exclusionary clauses, only included damage to tangible property and not consequential damages such as loss of use. The trial court therefore concluded that loss of use was not excluded under the policy.
CU contends that the definition of property damage set out above is a part of the policy, and pursuant to that definition the loss of use of property, whether it is damaged itself or not, is property damage. We have examined the insurance policy at issue and found that line six of the declarations page reads in pertinent part: "Forms and Endorsements made part of this Policy at time of issue applicable to All Sections: MP 00 90 (1/83) ... Section II Only: G802; ... L6111...."
Forms G802 and L6111 contain the insuring agreement and exclusions set out above and are part of section II of the policy.[6] *890 Form MP 00 90 contains the definitions set out above, including property damage, under the heading "definitions applicable to section II." From this we conclude that the definition of property damage set forth above is a part of the policy and is applicable to the exclusions at issue since they are contained in section II. Loss of use of the road is therefore unambiguously excluded from coverage under the policy and the trial court was manifestly erroneous in concluding otherwise.
In finding coverage for Hartman's faulty engineering advice, faulty design, and failure to warn of the consequences of inadequate subsurface preparation, the trial court found that these claims were "not for property damage `arising out of the work' done by Hartman," and thus were not excluded by either exclusion set out above.
Hallar's third supplemental and amending petition alleged in part that Hartman "designed and engineered the road and furnished advice to Petitioner with respect to the building and specifications of the road." Accepting these allegations as true, any property damages arising out of Hartman's faulty engineering advice or faulty design must arise out of the work done by Hartman, since the petition alleges that Hartman did provide these services.
The allegation that Hartman failed to warn of the inadequate base is the heart of Hallar's case and the primary element in this article 2762 case against a road builder for building an otherwise satisfactory road on an insufficient base. If Hartman had pointed out the insufficiency of the base to Hallar prior to building the road, Hallar would have no recourse against Hartman.
Article 2762 imposes a duty upon contractors to construct a work that is suited for its intended purpose and to perform their work in a good and workmanlike manner free from defects in materials and workmanship. Hartman's failure to warn of an insufficiency in the foundation upon which it built is nothing more than a breach of its warranty of workmanlike performance. Any damages arising from this necessarily arise from the work performed by the contractor, in this case Hartman.
Indeed, all of the damages claimed by Hallar arise out of Hartman's allegedly defective work, i.e. overlaying the limestone road with asphalt without first testing the sufficiency of the base and either strengthening it or informing Hallar of its insufficiency. The exclusions relied on by CU, the completed operations hazard exclusion and work product exclusion, are designed specifically to exclude such damages. These exclusions basically exclude from coverage any property damage to work performed by Hartman which arises out of operations or a reliance upon a representation or warranty made with respect thereto.
Several prior cases have held that work product exclusions similar to the ones relied on by CU exclude coverage for defective or faulty workmanship and consequential damages arising therefrom. Barr v. Cool Vue Aluminum, Inc., 439 So.2d 1161 (La.App. 4th Cir.1983); Magill v. Owen Construction Company, Inc., 434 So.2d 520 (La.App. 2nd Cir.1983); Vitenas v. Centanni, 381 So.2d 531 (La.App. 4th Cir. 1980); Breaux v. St. Paul Fire and Marine Insurance Company, 345 So.2d 204 (La.App. 3rd Cir.1977); Vobill Homes, Inc. v. Hartford Accident & Indemnity Company, 179 So.2d 496 (La.App. 3rd Cir.1965), writ denied, 248 La. 698, 181 So.2d 398 (La.1966).
As the Third Circuit succinctly pointed out:
These cases stand for the proposition that a liability insurer who includes a "work product" exclusion in its policy is not liable for damages to the work product (in many cases a building or structure of some sort) of the insured due to negligent, faulty, or defective construction and workmanship. In other words, the courts recognize that liability policies are not performance bonds.
Breaux v. St. Paul Fire and Marine Insurance Company, 345 So.2d at 207-08.
*891 Therefore, the trial judge erred in finding that CU had a duty to defend Hartman from Hallar's suit and in awarding attorney's fees to Hartman from CU. CU had no duty to defend Hartman because Hallar's petition prayed for damages which were unambiguously excluded from coverage under CU's policy.
Therefore, for the above and foregoing reasons, it is ORDERED, ADJUDGED and DECREED that the judgment of the trial court on the main demand, in favor of the defendants, David S. Hartman, Jr., Hartman Enterprises, Inc., and Commercial Union Insurance Company, and against Hallar Enterprises, Inc., dismissing plaintiff's demands, is hereby AFFIRMED.
It is further ORDERED, ADJUDGED and DECREED that the judgment of the trial court in favor of third party plaintiffs, David S. Hartman, Jr., and Hartman Enterprises, Inc., and against third party defendant, Commercial Union Insurance Company, is hereby REVERSED. Costs of this appeal are assessed one half to Hallar Enterprises, Inc. and one half to Hartman Enterprises, Inc. and David S. Hartman, Jr.
AFFIRMED IN PART AND REVERSED IN PART AND RENDERED.
NOTES
[1] This is an abandoned oil well that has been converted into an oilfield waste disposal facility. Hallar disposes of brine, an oil well by-product, by injecting it back into the earth via its saltwater injection well.
[2] Soil cement is a method of preparing the base of a road prior to surfacing it. It involves mixing the existing soil with portland cement and water. This provides a solid base and moisture barrier suitable for surfacing with asphalt. In order to utilize soil cement in this case, the limestone surface of the road would have had to be removed.
[3] All three experts who testified were civil engineers.
[4] This petition replaced Hallar's original and first and second supplemental and amending petitions entirely by amending each of them in its entirety to read as the third supplemental and amending petition.
[5] Through a broad form endorsement to the policy (form L611), exclusion (3) replaced the original exclusion (o). See footnote 6 below.
[6] Form G802 is entitled "COMPREHENSIVE GENERAL LIABILITY COVERAGE PART (Special Multi-Peril Policy)." It contains the insuring agreement set forth above and exclusions (a) through (q). (Including exclusion (n) set forth above).

Form L6111 is entitled "BROAD FORM COMPREHENSIVE GENERAL LIABILITY ENDORSEMENT." It provides that "[t]his endorsement modifies such insurance as is afforded by the provisions of the policy relating to the following: COMPREHENSIVE GENERAL LIABILITY INSURANCE."
Section VI of form L6111 is entitled "BROAD FORM PROPERTY DAMAGE LIABILITY COVERAGE (Including Completed Operations)" and provides that "The insurance for property damage liability applies, subject to the following additional provisions: (A.) Exclusions (k) and (o) are replaced by the following: ...." Exclusion (1) through (3), including exclusion (3) set forth above, are then listed.