STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

2019 CA 0709

KELLY MCHUGH AND ASSOCIATES, INC.

VERSUS

RPDE DEVELOPMENT, LLC, DAVID W. JOHNSON, PHILLIP G.
MAYEAUX AND EDWARD J. VAN HOVEN

*DATE OF JUDGMENT:*    MAR 0 5 2020

ON APPEAL FROM THE TWENTY-SECOND JUDICIAL DISTRICT COURT
NUMBER 2012-12905, DIVISION I, PARISH OF ST. TAMMANY
STATE OF LOUISIANA

HONORABLE REGINALD T. BADEAUX, III, JUDGE

* * * * * *

Richard A. Richardson
Covington, Louisiana

Counsel for Defendant-Appellee
RPDE Development, LLC

David M. Cohn
D. Brian Cohn
Bartley Paul Bourgeois
Allyson S. Jarreau
Baton Rouge, Louisiana

Counsel for Defendant-Appellant
Daton Contracting, Inc.

* * * * * *

BEFORE:  McDONALD, THERIOT, AND CHUTZ, JJ.

**Disposition: APPEAL MAINTAINED; MARCH 8, 2018 JUDGMENT AFFIRMED; JANUARY 31, 2019 JUDGMENT VACATED; REMANDED WITH INSTUCTIONS.**

**CHUTZ, J.**

Third-party defendant-appellant, Daton Contracting, Inc. (Daton), appeals the trial court's judgment awarding damages and costs in favor of third-party plaintiff-appellee, RPDE Development, LLC (RPDE), for substandard work in the construction of a subdivision roadway. We affirm in part, vacate in part, and remand with instructions.

## FACTUAL AND PROCEDURAL BACKGROUND

Kelly McHugh and Associates, Inc. (McHugh) is an engineering firm that contracted with RPDE to provide engineering and survey services in connection with the development of land located in Mandeville, Louisiana into a subdivision. McHugh commenced this litigation by filing a claim against RPDE for its alleged failure to pay fees and costs due under the terms of a contract. RPDE responded with a reconventional demand against McHugh and this third-party demand against Daton. RPDE alleged that pursuant to a written agreement, Daton was required to remove and replace soil cement that had failed in conjunction with the construction of a roadway but had instead submitted an invoice to RPDE for the work. Initially, RPDE refused to pay but because an impending sale of the developed property from RPDE to a residential developer was unable to close without payment of the invoice to Daton, RPDE paid the outstanding amount at the closing. In its third-party demand, RPDE demanded damages from Daton. Daton answered the third-party demand, generally denying RPDE's allegations.

RPDE and McHugh voluntarily settled their claims against one another, and the matter proceeded to trial on the third-party demand. After the introduction of testimony and documentary evidence, the trial court found in favor of RPDE and, in three separate judgments, awarded damages and costs against Daton. Daton appealed.

2

## VIABILITY OF THE APPEAL

The first judgment that the trial court entered was on March 8, 2018, stating the following:

> IT IS HEREBY OR[DERED], ADJUD[GED] AND DECREED that ... [Daton] is to pay ... [RPDE] an amount of $91,228.00 in damages and ... all costs of these proceedings, including any expert witness fees and depositions used at trial.

Thereafter, the trial court, apparently on its own motion, issued an "AMENDED JUDGMENT" on March 29, 2018, which provided:

> IT IS HEREBY OR[DERED], ADJUD[GED] AND DECREED that ... [Daton] is to pay ... [RPDE] an amount of $91,228.00 in damages and ... [RPDE's] costs of court in the amount of $2,167.45.

On April 5, 2018, RPDE filed a motion for new trial, contending that the March 29, 2018 amended judgment failed to provide the amount for "expert fees and deposition costs." A hearing on the motion for new trial was held on December 4, 2018, and on January 31, 2019, the trial court signed the third judgment, which provided in pertinent part:

> IT IS HEREBY OR[DERED], ADJUD[GED] AND DECREED that ... [Daton] is to pay ... [RPDE] ... the amount of [$15,053.75] in Expert Witness Fees as well as an additional $234.50 in Deposition Costs for a total amount of [$15,288.25].

Daton filed a motion and order for a devolutive appeal on April 13, 2018, expressly naming the March 8, 2018 judgment as well as the March 29, 2018 "AMENDED" judgment as the subjects of the appeal. The trial court withheld acting on Daton's motion and order for the devolutive appeal until after the December 4, 2018 hearing on RPDE's motion for new trial and its January 31, 2019 judgment. On February 15, 2019, Daton filed its second motion and order for a devolutive appeal, specifically mentioning that the motion and order for a devolutive appeal that it had filed April 13, 2018 was still pending. On February

3

26, 2019, the trial court signed an order that expressly granted Daton an appeal from all three judgments.[1]

After the record was lodged, this court issued a show cause order, noting the January 31, 2019 judgment failed to reflect that the terms of either the March 8, 2018 or the March 29, 2018 judgments had been incorporated into it, and questioning the propriety of the March 29, 2018 amended judgment. A ruling on the show cause order was subsequently referred to this panel. See *McHugh and Assocs., Inc. v. RPDE Dev., LLC*, 2019-0709 (La. App. 1st Cir. 9/3/19) (unpublished action).

On its face, the March 8, 2018 judgment appears to have been a final judgment of its own accord. It resolved all the issues on the merits between the parties, and Daton timely sought an appeal of that judgment on April 13, 2018. It is unclear why the trial court, rather than issuing a new judgment addressing solely the amount of costs as it is authorized to do under La. C.C.P. art. 2088,[2] unilaterally decided to "amend" the judgment on the merits to include a specific amount for court costs. However, Daton timely sought appeals from all of the trial court's judgments.

It is well settled that appeals are favored in the law and should be maintained unless a legal ground for dismissal is clearly shown. *Edgefield v. Audubon*

---

[1] Although the signed order of appeal references "the judgment ... amended on April 3, [2018]," reading the motion and order as a whole, it is clear Daton intended to appeal the "AMENDED JUDGMENT" signed on March 29, 2018. Moreover, the amount of court costs set forth in the March 29, 2018 judgment was not challenged by Daton in its appeal.

[2] La. C.C.P. art. 2088 provides in relevant part:

A. The jurisdiction of the trial court over all matters in the case reviewable under the appeal is divested, and that of the appellate court attaches, on the granting of the order of appeal and the timely filing of the appeal bond, in the case of a suspensive appeal or on the granting of the order of appeal, in the case of a devolutive appeal. Thereafter, the trial court has jurisdiction in the case only over those matters not reviewable under the appeal, including the right to...

(10) [s]et and tax costs and expert witness fees.

4

*Nature Institute, Inc.*, 2018-1782 (La. 1/18/19), 261 So.3d 776 (per curiam). Here, any issues related to the addition of costs to the March 8, 2018 merits judgment were created by the trial court amending the initial judgment on its own motion. Daton, as appellant, timely sought appellate review by filing the requisite motions following each of the trial court's rulings. As such, any defects that may exist are not attributable to the appellant. See La. C.C.P. art. 2161 ("An appeal shall not be dismissed because of any other irregularity, error or defect unless it is imputable to the appellant."). Accordingly, the appeal is maintained.

## MERITS OF APPEAL

### Liability

Daton maintains that the trial court erred in applying La. C.C. art. 2762 to support its conclusion that substandard workmanship caused RPDE's damages. La. C.C. art. 2762 provides in pertinent part:

> If a building, which an architect or other workman has undertaken to make by the job, should fall to ruin either in whole or in part, on account of the badness of the workmanship, the architect or undertaker shall bear the loss.

Although Article 2762 refers only to a "building," the jurisprudence has extended its application to include the surfacing of streets and parking lots with asphalt. *Hallar Enterprises, Inc. v. Hartman*, 583 So.2d 883, 886 (La. App. 1st Cir. 1991). With respect to defects in the soil or a defect in the existing base of the road to be overlaid, Article 2762 imposes liability upon a contractor only for building upon a site that he knew or should have known was defective. The contractor is liable only for failing to correct or disclose obvious or apparent soil defects and not latent or hidden defects. *Id.* (citing *Wurst v. Pruyn*, 250 La. 1109, 202 So.2d 268 (La. 1967)).

5

If an undertaker fails to do the work he has contracted to do, or if he does not execute it in the manner he has agreed to do it, he shall be liable in damages for the losses that may ensue from his non-compliance with his contract. La. C.C. art. 2769. In order to recover damages from a contractor, the owner must establish: (1) the defects exist, (2) that faulty workmanship caused the defects, and (3) the cost of repairing the defects. The owner has the burden of proving each element of the claim by a preponderance of the evidence. *Matherne v. Barnum*, 2011-0827 (La. App. 1st Cir. 3/19/12), 94 So.3d 782, 789, writ denied, 2012-0865 (La. 6/1/12), 90 So.3d 442. But the contractor is not responsible for a latent or hidden defect in the soil, that is, a defect which was neither apparent to nor reasonably discoverable by the builder during construction. *Harris v. Williams*, 28,512 (La. App. 2d Cir. 8/23/96), 679 So.2d 990, 994. See *Hallar Enterprises, Inc.*, 583 So.2d at 886.

A trial court's factual findings will not be reversed unless manifestly erroneous or clearly wrong. A reviewing court must determine whether the factfinder's conclusions were reasonable based upon the entire record. *Stobart v. State*, 617 So.2d 880, 882-83 (La. 1993).

In its written reasons for judgment, the trial court stated:

Daton by contract was to construct sewer, water (excluding all well points), curbing, soil cement, asphalt, clearing entire site except for green space, grubbing, drainage, pipe, seeding, retention pond, clearing and filling of all lots as per instruction of [the residential developer's] representative Lee Foster.

A crucial part of the contract called for Daton to prepare the road base with a combination of soil and cement (soil cement) to a depth of 8 inches. However, just prior to applying the soil cement there was a significant rain event that rendered the road beds saturated with water to the point that the application of the soil cement would not cure properly.

Daton, as a road construction contractor, should have known that the subsoil conditions at the time of its application of the soil cement would not be successful. ... Daton acted unilaterally on its

6

own to proceed. Further, the excessive moisture in the soil is not a latent defect which would absolve Daton of responsibility.

A reasonable factual basis exists for the trial court's conclusion.

Phillip Mayeaux of RPDE testified that Daton's first application of the cement into the soil (referred to by the witnesses as a "cutting") for the construction of the roadways within the Lexington Place subdivision was on March 14, 2011. Around noon that day, Mayeaux visited the site and was surprised that the cutting was underway given the wet conditions of the subdivision after a two-day rainfall on March 8 and 9, 2011, and because he had not been notified by Daton of the undertaking. According to Mayeaux, conditions in the subdivision "weren't very good." He was unable to drive his truck too far into the subdivision. Mayeaux recalled that the ditches were about three-quarters full of water and the pond was also full. He believed that when Daton undertook the cutting on March 14, 2011, the subdivision was too wet and that the sub-base had been compromised such that it was unable to hold the roadbed. Mayeaux explained that either the day of the cutting or within the next couple of days, as the integrity of the soil cement was tested, the failure was detected.

Mayeaux acknowledged that drainage was a problem in the subdivision particularly after the rain event and stated that before the March 14, 2011 cutting, he saw Daton pumping water out of the pond. Mayeaux also admitted that Daton was not responsible for the drainage issues.

Clayton Fauntleroy of Daton testified. He agreed with Mayeaux that before the March 14, 2011 cutting, there had been a substantial rainfall. Fauntleroy explained that the water was so significant it did not remove itself from the site, and that Daton had to pump it out of the subdivision. According to Fauntleroy, there were no major issues with the cutting and none of the heavy equipment had

7

become stuck or bogged down. He recalled that in most places, the soil cement did not initially fail. Fauntleroy described how during the process undertaken to test the integrity of the soil cement, it began to crack up "like an eggshell" and that "once that cement breaks, it doesn't go back together."

Fauntleroy conceded that there was too much moisture in the sub-base and that it compromised the street. He pointed to issues with the drainage from his first day on the job, indicating there was no off-site drainage and that "[t]here was nothing done about that." Fauntleroy acknowledged that it was his responsibility to check the soil prior to commencement of the cutting. He stated, however, that before he undertook the March 14, 2011 cutting, neither McHugh nor anyone else on the project advised him of a need to deviate from the scheduled date of the soil cement application because of rainfall or drainage issues. He remembered having contacted McHugh prior to undertaking the cutting as scheduled on March 14, 2011 to notify of Daton's intentions, suggesting that most likely he left a message with a secretary. Fauntleroy admitted that the remedial work with the soil cement was not undertaken pursuant to a change order as had been done with other project modifications.

Leonard C. Quick was admitted as an expert forensic engineering, particularly in civil engineering and structural engineering. He opined that the failure of the soil cement was because of the condition of the sub-base and the role of Daton in causing the failure. After validating the occurrence of the weather event that left between seven and eight inches of rain on March 8 and 9, 2011, interviewing Mayeaux, and reviewing Fauntleroy's deposition, Quick determined that the sub-base was no longer compacted as required by McHugh's plans and specifications. The roadway design called for four inches of asphalt, an eight-inch soil cement-treated base, and a six-inch compacted sub-base. Quick explained that

8

once the rain fell, the sub-base was saturated and softened, which wiped out the compact work. He believed that Daton needed to compact the sub-base again after allowing it to dry out and prior to applying the cement into the soil.

Based on his review of Mayeaux's and Fauntleroy's accounts of conditions on March 14, 2011, Quick concluded that the ground water and surface runoff had already begun to lower since the ditches were three-quarters full and the pond was full. While water was not sitting on or cascading over the entire development, it was nevertheless Quick's opinion that the sub-base was saturated and wet such that it was not suitable for cutting. Quick advised that the sub-base needed time to dry out before the soil cement cutting. Because it was Daton's work, Quick stated that Daton was responsible for the condition of the sub-base, since its contract with RPDE did not delegate that responsibility to another party.

Quick testified that any pre-existing drainage issues may have been a partial source of the moisture in the sub-base along with the torrential rainfall turning the upper layer to mush and slop, but he still found Daton responsible for the untimely cutting of the soil cement since Daton was in control of the entire cutting process and had to account for the wetness of the soil. Quick determined that as an experienced road construction contractor, Daton should have had knowledge of the effect of moisture on the sub-base irrespective of its source. He explained to the trial court that a certain amount of common sense to determine when to proceed was required of Daton.

Based on the foregoing review of the evidence, a reasonable factual basis exists for the trial court's conclusion that the failed soil cement application was an apparent defect that was caused by Daton's faulty workmanship. Although Daton asserts that it was not responsible for the failed work since it performed in

9

accordance with the plans and specifications furnished by McHugh,[3] the trial court rejected that assertion. Based on the testimony of Mayeaux and Fauntleroy as to the conditions at the time of the March 14, 2011 cutting and Quick's explanation of the effect of those conditions on the sub-base, the record supports an implicit finding that Daton failed to comply with McHugh's requirement of a six-inch compacted sub-base. And while it is true that Fauntleroy testified that the heavy equipment did not bog down or become stuck in the soil during the March 14, 2011 cutting, he clearly acknowledged the wet conditions of the subdivision and that it was his responsibility to check the soil prior to commencement of the cutting. Fauntleroy's testimony, Mayeaux's description of the site conditions, and Quick's articulation of Daton's responsibilities as the roadway construction contractor provide ample support for the trial court's finding that the failure of the soil cement was caused by Daton's faulty workmanship. Accordingly, the trial court was not manifestly erroneous.

**Damages**

Daton asserts that the amount of damages should be reduced to reflect that a portion of the remedial work changed the design of the roadbed from a depth of eight inches of soil cement as initially set forth in the plans and specifications to twelve inches. The contractor suggests that the trial court's award allowed RPDE to recover more than the amount for which it originally bargained.

The measure of damages for a breach of contract is the sum that will place plaintiff in the same position as if the obligation had been fulfilled. *LAD Services*

---

[3] See La. R.S. 9:2771 ("No contractor ... shall be liable for destruction or deterioration of or defects in any work constructed, or under construction, by him if he constructed, or is constructing, the work according to plans or specifications furnished to him which he did not make or cause to be made and if the destruction, deterioration, or defect was due to any fault or insufficiency of the plans or specifications. This provision shall apply regardless of whether the destruction, deterioration, or defect occurs or becomes evident prior to or after delivery of the work to the owner or prior to or after acceptance of the work by the owner. The provisions of this Section shall not be subject to waiver by the contractor.").

*of Louisiana, L.L.C. v. Superior Derrick Services, L.L.C.*, 2013-0163 (La. App. 1st Cir. 11/7/14), 167 So.3d 746, 761, <u>writ not considered</u>, 2015-0086 (La. 4/2/15), 162 So.3d 392. <u>See also</u> La. C.C. art. 1995 (providing that the measurement of damages for a breach of contract includes the loss sustained by the obligee).

The trial court awarded $91,228.00, which consisted of $9,000.00 for the processing of new roads, $34,000.00 for the processing of the new soil cement, and $48,228.00 for new soil cement. This amount was supported by Mayeaux's testimony that the corrective re-compaction and the drying out of the initial failed soil cement cost $9,000.00; as well as the invoice from Daton showing $82,228 for the other items.[4]

It is undisputed that after the failed cutting on March 14, 2011, a meeting was held at which time a plan to remedy the defective soil cement was confected. Both Mayeaux and Fauntleroy were present along with representatives from McHugh. According to Fauntleroy, McHugh suggested that Daton remix the existing soil to a deeper depth. He was then asked the cost of implementation of the new plan and provided with a new design. Fauntleroy testified that he was not informed that he would not be paid for the remedial work. After the remedial work plans and specifications were implemented in a second cutting, Fauntleroy acknowledged that the roadway construction was successful.

A reasonable factual basis exists to establish that the remedial work which arose as a result of Daton's faulty workmanship placed RPDE in the same position as if Daton had correctly fulfilled its obligation with its first application of cement to the soil. Mindful that at the meeting Fauntleroy attended with Mayeaux and McHugh representatives, Daton neither complained about the remedial work

---

[4] Mayeaux did not dispute, and paid to Daton, $5,600.00 for a new drainage ditch that was added to the subdivision after the March 2011 rainfall event and also reflected in the invoice that included the remedial work charges.

11

design plan nor offered a less expensive alternative by which RPDE could have been placed in the same position as if the soil cement had never failed, there is no error in the trial court's award of damages based on the additional expenses Daton incurred in curing its defective work.

Daton next maintains that the trial court's award of $91,228.00 is insupportable because RPDE failed to express that its payment to Daton for the remedial work at the closing was made under protest. Thus, the contractor urges the trial court's award should be reversed.

The acceptance of a work without objection, protest, or complaint respecting the manner of performance estops the owner from recovery of damages resulting from defective work. However, acceptance with the understanding that certain defects will be remedied does not bar recovery for the cost of remedying such defects. *Brouillette v. Consol. Constr. Co. of Florida, Inc.*, 422 So.2d 176, 177-78 (La. App. 1st Cir. 1982).

It is undisputed that the failure of the application of cement into the soil was obvious almost immediately after Daton executed the work. The meeting in which the plan to remedy the defect with the soil cement occurred soon after the failure and, according to Mayeaux, he made it clear that he was protesting. Although Mayeaux admitted he never made a demand on Daton to absorb the costs of the redial work, Fauntleroy testified that all parties present at the meeting looked to Daton to articulate the costs of the remedial work. Most importantly, it is undisputed that Mayeaux was aware of the defective soil cement and was an active instrumentality in instigating a remedy. The application of the cement to the soil was not a defect that RPDE accepted without objection such that it is estopped from recovering damages from Daton for its faulty workmanship in the

12

construction of the roadways in the subdivision. Therefore, the trial court correctly rejected Daton's contention that RPDE was estopped from recovering damages.

In its final challenge of the trial court's award of damages, Daton contends it is entitled to an offset for the amount received by RPDE in settlement of its claims against McHugh. Daton maintains that by settling with McHugh prior to the trial of the third-party demand, "[c]learly, RPDE has double-dipped for the damages it already recovered from [McHugh]."

When each of different obligors owes a separate performance to one obligee, the obligation is several for the obligors. A several obligation produces the same effects as a separate obligation owed by each obligor to an obligee. La. C.C. art. 1787. An obligation is solidary for the obligors when each obligor is liable for the whole performance. A performance rendered by one of the solidary obligors relieves the others of liability toward the obligee. La. C.C. art. 1794. Solidarity of obligation shall not be presumed. A solidary obligation arises from a clear expression of the parties' intent or from the law. La. C.C. art. 1796. An obligation is solidary among debtors when they are obliged to the same thing so that each may be compelled for the whole. *Boudreaux v. Jeff*, 2003-1932 (La. App. 1st Cir. 9/17/04), 884 So.2d 665, 672. A transaction or compromise between the obligee and one obligor benefits the other solidary obligors in the amount of the portion of that obligor. La. C.C. art. 1803.

In the reconventional demand, RPDE averred that during construction, problems arose due to McHugh's faulty work, including that the soil cement failed in part because the depth recommendations by McHugh were faulty, the drainage plan design caused the subsoil to have too much moisture, and McHugh failed to properly monitor the application of the cement to the soil, all of which caused the need for remedial work. However, RPDE additionally alleged that McHugh's

13

original drainage design failed to work properly. Thus, on the face of the pleadings, McHugh's alleged liability to RPDE was not fully coextensive with Daton's liability as a result of the trial on the third-party demand.

During trial, Daton raised the issue of the amount of the settlement between McHugh and RPDE. Initially, the trial court did not allow the settlement agreement into evidence but later did so. After the conclusion of evidence, the trial court took the matter under advisement. In the trial court's subsequent written reasons for judgment, the issue of Daton's entitlement to a credit for RPDE's settlement with McHugh was noted as a contention but its disposition was not expressly addressed.

Silence in a judgment of the trial court as to any issue, claim, or demand placed before the court is deemed a rejection of the claim and the relief sought is presumed to be denied. *Alost v. Lawler*, 2018-1271 (La. App. 1st Cir. 5/8/19), 277 So.3d 329, 333 n.3.

Here, as noted in its written reasons for judgment, the trial court cast Daton for "the full sum of $91,228.00," thus, implicitly finding that any liability between Daton and McHugh in favor of RPDE was separate, not solidary. We have already concluded that the trial court's factual conclusion that the failed soil cement application was an apparent defect that was caused by Daton's faulty workmanship was supported by the evidence and, therefore, not manifestly erroneous.

Additionally, an implicit factual finding that McHugh was not liable for the failed soil cement by having created plans and specifications that required soil cement to a depth of eight inches was likewise supported by the evidence. Quick testified that the eight-inch depth was suitable for the sub-base but for the issue with the moisture content that he attributed to Daton's decision to apply the cement despite the wet conditions in the subdivision. The trial testimony of Kelly McHugh of the McHugh engineering firm indicated that the original plan with an eight-inch

14

depth would have been satisfactory with a subbase compacted in accordance with the plans and specifications. He explained that the additional four-inch depth was determined as a result of the March 14, 2011 cutting and done to ensure that the subbase after the application of the cement on March 14, 2011 properly dried out.

We also note that the settlement agreement does not express a dollar amount as a part of the transaction and compromise between RPDE and McHugh. The plain language of the agreement shows only that each party dismissed their respective claims against the other. While Daton contends that RPDE "[c]learly" received a credit in the amount that McHugh demanded in its original petition, nothing in the record supports such a supposition. Indeed, Mayeaux's testimony that he believed RPDE did not owe McHugh the amount it claimed belies Daton's contention. Accordingly, Daton was not entitled to an offset for the settlement.

**Expert Witness Fees**

The party cast in judgment will generally be assessed with all costs of the litigation, including its own and those of the prevailing party. See La. C.C.P. art. 1920. The trial court has great discretion in awarding costs, including expert witness fees, deposition costs, exhibit costs, and related expenses. On appeal, the trial court's assessment of costs will not be disturbed absent an abuse of discretion. *Reynolds v. Louisiana Dep't of Transp.*, 2015-1304 (La. App. 1st Cir. 4/13/16), 194 So.3d 56, 59.

The taxing of expert witness fees is governed by La. R.S. 13:3666, which provides:

> A. Witnesses called to testify in court only to an opinion founded on special study or experience in any branch of science, or to make scientific or professional examinations, and to state the results thereof, shall receive additional compensation, to be fixed by the court, with reference to the value of time employed and the degree of learning or skill required.

15

B. The court shall determine the amount of the fees of said expert witnesses which are to be taxed as costs to be paid by the party cast in judgment either:

(1) From the testimony of the expert relative to his time rendered and the cost of his services adduced upon the trial of the cause, outside the presence of the jury, the court shall determine the amount thereof and include same.

(2) By rule to show cause brought by the party in whose favor a judgment is rendered against the party cast in judgment for the purpose of determining the amount of the expert fees to be paid by the party cast in judgment, which rule upon being made absolute by the trial court shall from a part of the final judgment in the cause.

Expert witnesses are entitled to reasonable compensation for their time in court and for preparatory work done. The trial court can fix expert witness fees based upon its own observations and evidence presented at trial. However, a party can only have taxed as court costs the reasonable cost of time spent by the expert in gathering facts necessary for his testimony, but not for time spent in consultation that only assists the attorney in preparation for the litigation. *Reynolds*, 194 So.3d at 60.

The trial court awarded $15,288.25 in fees and deposition costs related to Quick's expertise. On appeal, Daton complains that the invoices introduced at the hearing show "an outrageous attempt by RPDE to recoup costs" that were not fully related to the third-party claim. Additionally, Daton asserts that the invoices included work conducted by persons other than Quick.

The trial court may award the full amount charged by an expert witness if the amount is reasonable in light of the many factors considered in fixing expert witness fees, such as time spent in preparatory work for trial, the extent and nature of the work performed, the knowledge, attainments, and skill of the expert, and the helpfulness of the expert's report and opinion to the trial court. Generally, the amount and fixing of expert fees lies within the sound discretion of the trial court

16

and will not be disturbed in the absence of an abuse of discretion. Fees of expert witnesses may be reduced if expenses were needlessly or excessively incurred. *Id.*, 194 So.3d at 61.

The record reveals no evidence that RPDE caused costs to be incurred needlessly or pointlessly, but we are mindful of the incidental actions that initially comprised this litigation. Importantly, it has long been the law that the assertion of an attorney and the bill of an expert do not support an award for the total time of an expert, both in court and outside of court. Rather, the expert must testify at the trial of the contradictory rule to tax costs and be subject to cross-examination, unless there is some stipulation between the parties. *Id.*

Here, the trial court raised the issue of the quantum of the costs originally awarded in the March 8, 2018 final judgment by way of the March 29, 2018 judgment that it issued without a rule or a motion for new trial before it. This action by the trial court gave rise to RPDE's subsequent request for the inclusion of the expert witness fees within the costs assessment raised by a new trial motion that was timely as to the March 29, 2018 judgment but untimely as to the original final judgment of March 8, 2019. RPDE did not present Quick as a witness at the December 4, 2018 hearing on its motion for new trial; but Daton did not object to the introduction of Quick's itemized charges for his fee.

The mere assertions of RPDE's attorney and the submitted invoices representing the amount of fees that Quick charged RPDE are insufficient to support the trial court's award of out-of-court work costs of the expert witness. The burden of proving the value of Quick's out-of-court services was on RPDE, and although RPDE submitted the expert's invoices at the hearing, those invoices are insufficient to establish the value of the services. The law requires a contradictory and full hearing, with the burden of proving the reasonable value of the expert

17

witness's out-of-court work on RPDE as the party seeking the costs. See *Reynolds*, 194 So.3d at 61-62.

Given the inadequacy in the record regarding the details of the fees charged by Quick, we simply cannot determine if the trial court's judgment taxing those costs to Daton was an appropriate exercise or an abuse of its discretion. Under these circumstances, we vacate the trial court's January 31, 2019 judgment that awards RPDE expert witness fees and deposition costs in the amount of $15,288.25 and remand for stipulations or a contradictory hearing to determine expert witness fees based on the trial court's personal observations at the trial as well as the parties' evidentiary support subject to cross-examination and the criteria discussed herein.

## DECREE

For these reasons, we maintain the appeal. The trial court's March 8, 2018 judgment is affirmed. The trial court's January 31, 2019 judgment is vacated and we remand this matter for a hearing to determine the amount of expert witness fees to which RPDE is entitled in accordance with this opinion. Appeal costs are assessed in the amount of two-thirds against Daton Contracting, Inc. and one-third against RPDE Development, LLC.

**APPEAL MAINTAINED; MARCH 8, 2018 JUDGMENT AFFIRMED; JANUARY 31, 2019 JUDGMENT VACATED; REMANDED WITH INSTRUCTIONS.**